IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| MICHAEL MILLER, JR., *et al.*,<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>HONOLULU POLICE DEPARTMENT, *et al.*,<br>　　　　Defendants. | Civil No. 23-00129 MWJS-WRP<br><br>ORDER GRANTING DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT |

## INTRODUCTION

Between 2012 and 2014, Defendants the City and County of Honolulu and the

Honolulu Police Department (HPD) seized eighty-one machines that were being used to

play "sweepstakes" games—games that HPD viewed as illegal gambling.  The

machines' owners were initially criminally charged with gambling offenses in

connection with the seizures, but the charges were eventually dismissed.  And so in

2016, the owners asked Defendants to give the machines back.  Defendants[1] refused,

---

[1]　Defendant Keith M. Kaneshiro was initially a named Defendant, but the claims against him were dismissed without prejudice due to Plaintiffs' failure to complete service.  *See* ECF Nos. 17 & 21.  In addition to the City and County of Honolulu and HPD, Plaintiffs also sue John and Jane Does, as well as Doe Governmental Entities.  ECF No. 1-1, at PageID.8.  Throughout this Order, the Court refers to all Defendants collectively, except where otherwise specified.

and they kept the machines in an HPD warehouse.  They did not, however, initiate forfeiture proceedings at any time.

Over six years later, in 2022, the owners of the machines, Plaintiffs Michael Miller, Jr., Eugene Simeona, Jr. and PJY Enterprises, LLC, brought this civil suit. Relying on a 2021 Hawaiʻi Supreme Court opinion, *Alm v. Eleven Prods. Direct Sweepstakes Machines*, 150 Hawaiʻi 329, 501 P.3d 298 (2021), Plaintiffs assert that because the eighty-one machines were never legally forfeited, Hawaiʻi state law requires the machines to be returned to them.  Because the machines were either destroyed, inoperable, or severely damaged, Plaintiffs seek damages for their un-returned property under both negligence and bailment theories.  They also raise constitutional challenges to Defendants' retention of their machines.

Defendants now move for summary judgment, contending that they are entitled to prevail as a matter of law.  First, they argue that claim and issue preclusion bar Plaintiffs' suit because their current claims were put squarely at issue in a prior 2012 federal lawsuit that Plaintiffs brought shortly after the machines' initial seizure. Second, Defendants argue that Hawaiʻi state law does not recognize their state-law claims.  Third, they contend that, as to one of those claims—negligence—Plaintiffs have failed to offer sufficient evidence of damages.  Finally, Defendants argue that Plaintiffs' claims should be dismissed for the separate reason that they are untimely under the governing statutes of limitations.  Plaintiffs oppose.

The first three of Defendants' arguments are not persuasive.  But because the

Court agrees that Plaintiffs' lawsuit was untimely filed, it GRANTS Defendants' motion

for summary judgment on the last ground.

## BACKGROUND

In December 2012 and February 2013, HPD seized eighty-one alleged gambling

machines pursuant to search warrants at various business locations in Honolulu.  ECF

No. 38, at PageID.148 (Defs.' Concise Statement of Facts (CSF) ¶ 1).  Plaintiffs Michael

Miller, Jr. and Eugene Simeona, Jr., through their respective business entities, owned

those machines.  *Id.* at PageID.149 (Defs.' CSF ¶ 11); ECF No. 45, at PageID.567 (Pls.'

CSF ¶ A).  At the time of seizure, the machines were programmed to play "Products

Direct Sweepstakes" (PDS) games.  *Id.* (¶ B).[2]

While these eighty-one machines are the focus of this case, they were not the

only alleged gambling devices HPD seized.[3]  In 2012, HPD began executing search

---

[2]     It is undisputed that the machines were programmed to play the PDS games at
the time they were seized.  Defendants, however, further contend that the seized PDS
machines were "programmed to *only* play the Products Direct Sweepstakes games."
ECF No. 38, at PageID.149 (Defs.' CSF ¶ 14) (emphasis added).  Plaintiffs dispute this
characterization.  *See* ECF No. 45, at PageID.563 (Pls.' Response to Defs.' CSF) ("The
PDS devices were programmed, at the time, to play the Products Direct Sweepstakes
games, but they . . . could be programmed to play games other than just PDS
sweepstakes games. . . .").

[3]     Although the complaint states that PJY Enterprises, LLC owned an additional
forty-six machines, ECF No. 1-1, at PageID.13, the parties have maintained in discovery
and briefing on this motion that there are only eighty-one machines at issue in the

warrants at various game business locations and seized a separate batch of seventy-

seven machines.  *See, e.g.*, ECF No. 38-3, at PageID.186; *Alm*, 150 Hawai'i at 330, 501 P.3d

at 299.  Miller, Jr., Simeona, Jr., and Tracy Yoshimura, the manager-member of PJY

Enterprises, LLC, were criminally charged in state court for their operation of these

venues and possession of the PDS machines.  ECF No. 45, at PageID.568 (Pls.' CSF ¶ H);

ECF No. 45-3, at PageID.579 (Miller, Jr. Decl. ¶ 4); ECF No. 38-2, at PageID.168.

Plaintiffs did not merely seek to defend themselves against those criminal

charges; they also took the offensive.  In 2012, PJY Enterprises, LLC filed a lawsuit—that

Simeona, Jr. and another entity, Mike, Inc.,[4] later joined—that was removed to federal

court.  ECF No. 38-3, at PageID.178.  The plaintiffs in that case sought a declaratory

judgment that the seizure and retention of the seventy-seven machines violated their

constitutional rights.  *Id.* at PageID.191-92.  They later amended their complaint to add

the subject eighty-one machines.  *Id.* at PageID.165-66; ECF No. 38-4, at PageID.220.  The

plaintiffs in that 2012 case maintained that the seizure of their property was unlawful

because the PDS machines did not violate Hawai'i state gambling laws.  ECF No. 38-3,

at PageID.191-93.  Plaintiffs also sought compensation for the alleged violations of their

---

present case.  *See, e.g.*, ECF No. 38, at PageID.148 (Defs.' CSF ¶ 1) (noting that "[t]he
subject matter of this lawsuit are eighty-one" PDS machines); ECF No. 45, at PageID.562
(Pls.' CSF) (declining to object to the number of machines at issue); ECF No. 38-16, at
PageID.403 (Yoshimura Dep. 25:1-22).

[4]    Mike, Inc. is owned by Miller, Jr.  ECF No. 38, at PageID.148 (Defs.' CSF ¶ 4);
ECF No. 45, at PageID.567 (Pls.' CSF ¶ A).

constitutional rights and the revenue lost from the plaintiffs' inability to use the machines.  *Id.* at PageID.195.  Ultimately, the Honorable Leslie E. Kobayashi, U.S. District Judge, granted summary judgment against the plaintiffs, holding that at the time the machines were seized, "the use of the PDS terminals constituted 'gambling,'" under Hawai'i state law.  *PJY Enters., LLC v. Kaneshiro*, No. CV 12-00577, 2014 WL 12694456, at *15 (D. Haw. Apr. 30, 2014).  The plaintiffs appealed the ruling, and the Ninth Circuit affirmed.  *PJY Enters., LLC v. Kaneshiro*, 679 F. App'x 621 (9th Cir. 2017).

Separately, on August 9, 2016, a state trial court held a hearing on the criminal charges against Miller, Jr., Simeona, Jr., and Yoshimura.  ECF No. 38-2, at PageID.168.  At that hearing, the state court announced that it would dismiss all criminal charges.  ECF No. 45-3, at PageID.579 (Miller, Jr. Decl. ¶ 4).  The state court's dismissal order was filed on October 27, 2016.  ECF No. 38-2, at PageID.168.  That same day,[5] Miller, Jr. "went down to the Honolulu Police Department, taking with [him] the dismissal of criminal charges document, and asked that the 81 PDS machines be released to [him]."  ECF No. 45-3, at PageID.579 (Miller, Jr. Decl. ¶ 5).  But HPD refused to return the machines, deferring to the prosecutor's office.  *Id.*  Miller, Jr. returned to HPD to check on the machines again sometime later "in 2016," and he "was told the Prosecutor's

---

[5]    Miller, Jr.'s declaration states that he visited HPD on August 9, 2016.  At the hearing on the pending motion, however, Plaintiffs' counsel clarified that the complaint more accurately described his client's testimony:  Miller, Jr. visited HPD on the very same day that the order dismissing the charges was filed, on October 27, 2016.  For reasons explained below, the date that Miller, Jr. visited HPD is a key date.

Office would not agree to release the 81 PDS machines."  *Id.* at PageID.579-80 (Miller, Jr.

Decl. ¶ 5); *see also* ECF No. 45, at PageID.568 (Pls.' CSF ¶ H).

Under Hawaiʻi state law, gambling devices may be subject to forfeiture.  Hawaiʻi

Revised Statutes (HRS) § 712-1230 (2014) ("Any gambling device . . . may be ordered

forfeited to the State, subject to the requirements of chapter 712A."); *id.* § 712A-4(b)

(2014) (including "gambling" as a covered offense).  Within twenty days of seizure, the

seizing agency must "give notice of seizure for forfeiture" to the parties who have an

interest in the property.  *See id.* § 712A-7(3) (2014).  At the same time, the seizing agency

must send "a written request for forfeiture within thirty days" of seizure to the

Honolulu prosecutor's office.  *See id.* § 712A-7(4) (2014).  And then, within forty-five

days of receiving that notice, the prosecuting attorney must "initiate administrative or

judicial proceedings against the property."  *Id.* § 712A-9(1) (2014).

Yet while Defendants refused to return the eighty-one PDS machines to

Plaintiffs, HPD never sent written notice of forfeiture to the Honolulu prosecutor's

office, which in turn never initiated forfeiture proceedings.  ECF No. 38, at PageID.149

(Defs.' CSF ¶ 10); ECF No. 45, at PageID.568 (Pls.' CSF ¶ H).  In September 2014, HPD

and the Honolulu prosecutor's office did initiate forfeiture proceedings for the other

seventy-seven machines that were also in HPD's custody.  *Alm*, 150 Hawaiʻi at 331-32,

501 P.3d at 300-01.  PJY Enterprises, LLC filed a lawsuit challenging the forfeiture of

those seventy-seven machines, *see* ECF No. 45-5, and that challenge resulted in the

Hawaiʻi Supreme Court's December 2021 *Alm* decision.  In *Alm*, the Hawaiʻi Supreme

Court held that HPD and the City and County of Honolulu's prosecutor's office had

failed to comply with the statutorily-required administrative forfeiture procedures,

described above.  150 Hawaiʻi at 335, 501 P.3d at 304.  And the court further held that

the remedy for such failure was the return of the seized property.  *Id.*  As the Hawaiʻi

Supreme Court put it, if the government "fails to follow" the state's statutory forfeiture

procedures, "the seizing agency must return the seized property."  *Id.*

In light of the *Alm* decision, Plaintiffs turned their attention back to the eighty-

one machines at issue in this case.  On November 15, 2022—more than six years after

the order dismissing the state criminal charges had been filed on October 27, 2016—

Plaintiffs initiated this action in state court seeking the return of the other eighty-one

machines, which remained in HPD's possession even though no forfeiture proceedings

had ever been initiated.  *See* ECF Nos. 1, 38-2.  This case was later removed to federal

court in March 2023.  *See* ECF No. 1.  On September 27, 2024, Plaintiffs' counsel, Keith

M. Kiuchi, and Yoshimura visited the HPD warehouse to examine the eighty-one

machines at issue.  ECF No. 45-1, at PageID.573 (Yoshimura Decl. ¶ 13).  They were only

allowed to view fifty-six of the machines, and all but one of those were inoperable

because they "wouldn't turn on, turned on then shut down, [or had] screen damage, or

termite damage to [the] cabinet."  *Id.*  And so in this action, Plaintiffs seek damages for

Defendants' alleged (1) negligent damage to the machines; (2) deficient bailment of the

7

machines; and (3) violations of Plaintiffs' constitutional rights—namely, their rights to be free from unreasonable seizures and to due process before any property deprivation. ECF No. 1, at PageID.14-17.

Defendants have filed a motion for summary judgment, contending that they should prevail as a matter of law.  ECF No. 37.[6]  Plaintiffs oppose.  ECF No. 46.  In advance of a hearing on the motion, the Court requested supplemental briefing on Defendants' contention that Plaintiffs' claims are barred by the relevant statutes of limitations.  ECF No. 52.  The parties submitted their supplemental briefs, ECF Nos. 53 & 54, and a hearing was held on January 23, 2025, ECF No. 55.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where a moving party shows there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The party seeking summary judgment initially bears the burden of showing there are no genuine disputes of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party, in turn, "must come

---

[6]    In addition to contending they should prevail as a matter of law, Defendants argue that one of the plaintiffs, PJY Enterprises, LLC, lacks Article III standing.  ECF No. 37-1, at PageID.139-40.  Because Defendants have not challenged the other Plaintiffs' standing, the Court need not decide whether PJY Enterprises, LLC has standing at this time.  *See Leonard v. Clark,* 12 F.3d 885, 888 (9th Cir. 1993), *as amended* (Mar. 8, 1994) (explaining that at the summary judgment stage, "the general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others").

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)). At the summary judgment juncture, the Court's role is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). Rather, the Court must take the nonmoving party's evidence as true and draw all reasonable inferences in the nonmoving party's favor. *See id.* at 631-32. That said, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. And the Court considers the evidence at the summary judgment stage under the same evidentiary burden that would govern a verdict—in this case, a preponderance of the evidence. *Id.* at 252.

//

//

//

## DISCUSSION

Defendants' principal contention is that as a result of the summary judgment

order in the 2012 lawsuit—affirmed by the Ninth Circuit on appeal—Plaintiffs'

negligence and bailment claims are barred by claim and issue preclusion.  Alternatively,

Defendants argue that the negligence and bailment claims are not cognizable under

Hawaiʻi state law in the specific factual circumstances of this case, and that Plaintiffs

have failed to adduce sufficient evidence of damages for their negligence claim.  Finally,

Defendants contend that all of Plaintiffs' claims are untimely under the applicable

statutes of limitations.  The Court considers each argument in turn.  And while it finds

Defendants' first three arguments unpersuasive, it ultimately agrees with the fourth.

### A.    Claim and Issue Preclusion

As noted, Defendants' claim and issue preclusion arguments arise from the 2012

case heard by Judge Kobayashi, in which several plaintiffs, including PJY Enterprises,

LLC, Mike, Inc., and Simeona, Jr., sought a declaratory judgment and injunctive relief

related to HPD's seizures of many PDS machines—including the eighty-one at issue in

this case.  *See* ECF No. 38-3.  The Court first describes the background of that 2012

lawsuit and then turns to Defendants' preclusion arguments.

### 1.    The 2012 Lawsuit

The plaintiffs in the 2012 case contended that the search and seizure of the PDS

machines violated various constitutional rights under the U.S. Constitution and the

Hawaiʻi Constitution, especially their rights to be free from unreasonable searches and

seizures. *Id.* at PageID.191-95. Specifically, the plaintiffs asserted that the PDS

machines did not violate Hawaiʻi gambling laws and therefore were not subject to

seizure. *Id.* The plaintiffs demanded, among other remedies, the immediate return of

their property and monetary damages for lost revenues because the plaintiffs could not

use or operate the PDS machines. *Id.* at PageID.193-95. Additionally, plaintiffs GS

Entertainment[7] and Mike, Inc. sought compensation for property damage incurred

when the defendants, who included HPD, damaged some of their personal property

and fixtures at the premises where the seizures occurred. *Id.* at PageID.196.

The defendants in the 2012 case moved for summary judgment and requested

that the court resolve a single issue: "whether the users of the PDS terminals ʻstake[d]

or risk[ed] something of value upon the outcome of a contest of chance' in order to

obtain a reward." *PJY Enters., LLC*, 2014 WL 12694456, at *3 (alteration in original)

(quoting HRS § 712-1220(4) (1976)). Under Hawaiʻi state law, it is a misdemeanor

offense to possess a gambling device. HRS § 712-1226 (2014). A gambling device is

defined as "any device, machine, paraphernalia, or equipment that is used or usable in

the playing phases of any gambling activity . . . [including] gambling by a person

involving the playing of a machine." *PJY Enters., LLC*, at *6 (quoting HRS § 712-1220(5)

---

[7]     GS Entertainment, Inc., was owned by Simeona, Jr. ECF No. 38, at PageID.148
(Defs.' CSF ¶ 7); ECF No. 45, at PageID.567 (Pls.' CSF ¶ A).

(1976)).  And "[a] person engages in gambling if he stakes or risks something of value

upon the outcome of a contest of chance or a future contingent event not under his

control or influence, upon an agreement or understanding that he or someone else will

receive something of value in the event of a certain outcome."  *Id.* (quoting HRS § 712-

1220(4)).  The defendants contended that they were entitled to summary judgment on

the basis that the PDS machines were illegal gambling devices and that it was therefore

lawful to seize them.  *See id.* at *10.  The court granted summary judgment to the

defendants, holding that "at the time of the seizures" of the machines, "the use of the

PDS terminals constituted 'gambling,' as that term is defined in Haw. Rev. Stat. § 712-

1220(4)."  *Id.* at *15.

### 2.    Plaintiffs' Claims Are Not Barred by Claim or Issue Preclusion

Relying on both issue and claim preclusion, Defendants contend that the 2012

lawsuit bars this one in full.

a.  Before turning to the merits of Defendants' preclusion arguments, the Court

addresses a threshold choice-of-law question.  In arguing for preclusion, Defendants

argue that federal common law applies and that this Court must apply a federal

preclusion standard.  *See* ECF No. 37-1, at PageID.128.  And it is true, as Defendants

point out, that the preclusive effect of a federal court's judgment is generally

"determined by federal common law."  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).

The Supreme Court has clarified, however, that for federal courts sitting in diversity, where the judgments concern state law claims, the federal common law incorporates the rules of preclusion "that would be applied by state courts in the State in which the federal diversity court sits." *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). As the Supreme Court explained, "any other rule would produce . . . forum-shopping and inequitable administration of the laws . . . since filing in, or removing to, federal court would be encouraged by the divergent effects that the litigants would anticipate from likely grounds of dismissal." *Id.* at 508-09 (cleaned up).

Judge Kobayashi's ruling in the 2012 case did not arise out of diversity jurisdiction, but rather—as in the present case—federal question and supplemental jurisdiction. *See* ECF No. 38-3. There appears to be some ambiguity over whether and to what extent federal common law incorporates state rules when a judgment is rendered based in part on supplemental—rather than diversity—jurisdiction. *See Hansen v. Musk*, 122 F.4th 1162, 1177 n.1 (9th Cir. 2024) (Collins, J., concurring in the judgment in part and dissenting in part) (noting the panel majority's "suggest[ion]" that federal common law would incorporate state law, but contending that federal common law should govern instead because the prior district court judgment arose out of an exercise of federal question and supplemental jurisdiction); *see also Hayes v. Rojas*, No. 20-cv-01820, 2021 WL 5356471, at *2 n.4 (E.D. Cal. Nov. 17, 2021) ("The presence of the state law claims in the prior lawsuit would have raised an unsettled issue, namely how

13

to approach the *res judicata* analysis when the prior state-law claims were before the federal court based upon supplemental, rather than diversity, jurisdiction.").  Judge Kobayashi's key ruling, moreover, concerned state law—in particular, whether the use of the PDS terminals constituted gambling under Hawai'i law.  Concerns about forum-shopping and inequitable administration of the laws might, therefore, conceivably be implicated.  *See Semtek*, 531 U.S. at 508-09.  And Plaintiffs, in their opposition, rely principally on Hawai'i state preclusion law, implying that they believe the fact of supplemental jurisdiction makes a difference.  ECF No. 46, at PageID.891-94.

Plaintiffs do not, however, make any argument in support of applying Hawai'i preclusion law; they offer no response to Defendants' argument that a federal standard should govern, and instead merely cite Hawai'i state cases and take for granted that those citations are appropriate.  Moreover, the state law cases that Plaintiffs cite appear to generally track the federal standard on which Defendants rely.  Plaintiffs have thus forfeited any argument that state law should apply or that it offers a more favorable foundation for their position.

The Court therefore assesses Defendants' claim and issue preclusion arguments under a federal standard and considers each doctrine in turn.

b.  Claim preclusion prevents parties from litigating any claims that either were raised or could have been raised in a prior action.  *See W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997).  For claim preclusion to bar a subsequent action,

14

there must be "1) an identity of claims, 2) a final judgment on the merits, and 3) identity or privity between parties."  *Id.*

Here, Plaintiffs do not dispute that the latter two elements are met.  *See* ECF No. 46, at PageID.891-94.  As to the second element, in the 2012 action, final judgment was entered in favor of the defendants on certain counts, and the other counts were dismissed with prejudice.  *See* ECF No. 38-5, at PageID.255-57; ECF No. 38-6, at PageID.258-59; ECF No. 38-8, at PageID.269-73.  The third element is also met because the parties in this action are either identical to or in privity with those present in the 2012 action.  Plaintiffs in this case—Miller, Jr. and Simeona, Jr.—are in privity with their respective corporate entity counterparts—Mike, Inc. and GS Entertainment, Inc.—that were plaintiffs in the 2012 action.  ECF No. 38, at PageID.148 (Defs' CSF ¶¶ 4, 5, 7, 8).  Plaintiffs Simeona, Jr. and PJY Enterprises, LLC[8] were also named plaintiffs in the 2012 action.  *Id.* (Defs' CSF ¶ 6); *id.* at PageID.149 (Defs' CSF ¶ 9).  In addition, HPD and the

---

[8]     Yoshimura, the sole manager-member of PJY Enterprises, LLC, notes in his declaration that he was "also the Manager and Member of PJY Enterprises, LLC (PJY2), which was administratively dissolved by the Dept. of Commerce and Consumer Affairs on June 1, 2018."  ECF No. 45-1, at PageID.570.  For that reason, while it appears that there may have been two separate business entities named PJY Enterprises, LLC, Yoshimura does not dispute that the present entity was a plaintiff in the 2012 action or that it would be in privity with the 2012 plaintiff entity.

City and County of Honolulu are named defendants in both cases.[9]  *See* ECF No. 1; ECF

No. 38-3, at PageID.178.

But the parties hotly contest the first element:  whether the two proceedings

share an "identity of claims."  In assessing this element, the "central criterion" is

"whether the two suits arise out of the same transactional nucleus of facts."  *Owens v.*

*Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001) (cleaned up).  And

superficially, at least, the claims in this suit and the 2012 suit appear to have arisen from

the same nucleus of facts—the seizures of PDS machines in December 2012 and

February 2013.

The Court cannot rest on that superficial similarity, however.  The identity-of-

claims element is not a verbal formula to be applied formalistically or abstractly.  It

instead requires a more grounded, practical analysis of whether "the plaintiff *actually*

*had the chance to be heard* on all of her claims in the first proceeding."  *Garity v. APWU*

*Nat'l Lab. Org.*, 828 F.3d 848, 856 (9th Cir. 2016).  In answering the question of whether

claims in two lawsuits are identical, the Court must bear in mind that claim preclusion

---

[9]    There are several unnamed defendants in this action, but Plaintiffs do not
dispute that Defendants are in privity with the parties in the 2012 action.  It is also likely
that any John and Janes Does, or Doe Governmental agencies, would have acted under
the direction of the City or HPD, such that their interests would have been sufficiently
common and therefore already litigated.  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l*
*Plan. Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) ("Even when the parties are not
identical, privity may exist if there is substantial identity between parties, that is, when
there is sufficient commonality of interest." (cleaned up)).

is only proper if "the first adjudication offer[ed] a full and fair opportunity to litigate."

*Id.* (alteration in original) (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481 & n.22

(1982)).

Plaintiffs offer an abstraction cutting in the opposite direction: they contend that

the 2012 action was distinct because it asserted constitutional claims based on the

seizures, but those claims were not related to "the damages to the PDS machines" now

asserted. ECF No. 46, at PageID.893. The only allegations related to monetary damages

in the 2012 action "concerned damages that occurred to personal property DURING the

Feb. 14, 2013 seizure," and not any damages that occurred "AFTER the machines were

seized." *Id.* For these reasons, Plaintiffs assert that the claims in the two suits are not

identical because they did not involve "infringement of the same right." *Media Rts.*

*Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1026 (9th Cir. 2019) (cleaned up).

Here again, though, the question is not whether a party can parse the claims in

two separate lawsuits and point to differences in their legal foundation. The inquiry

instead must be more concrete, giving weight to the differences in legal rights asserted

in the prior action only if—and to the extent that—those differences impeded a party's

ability to be heard on their claims in the initial suit.

In this case, the fact that the 2012 and the present lawsuit assert claims resting on

different legal rights does carry practical significance. That is because Plaintiffs could

not feasibly have initiated this action in 2012, when they litigated the case before Judge

Kobayashi, nor at any time before fall 2016, when the state trial court dismissed the

criminal proceedings.  Prior to the dismissal of the criminal charges, Plaintiffs could

only claim that the seizures were unlawful or that the machines were not evidence of

the charged illegal gambling offenses.  And if those arguments failed (as they did), then

the government had the authority to hold onto the eighty-one PDS machines as

evidence supporting the pending criminal charges.

It was not until October 27, 2016—when the dismissal order was filed—that

Plaintiffs had a viable claim that Defendants were improperly refusing to return their

property despite lacking any forfeiture or evidence-related authority to do so.  And it

was this post-dismissal refusal to return the property that resulted, according to

Plaintiffs' allegations, in damage to that unreturned property.  That is to say, the basis

of the claims in this case is that, *after* the criminal charges were dismissed in fall 2016,

Defendants *still* insisted on keeping the eighty-one machines—and then damaged those

machines—despite not having timely initiated forfeiture proceedings.  But the summary

judgment order in the 2012 case was entered in April 2014, more than two years before

that claim arose.  Viewed in this way, the harm Plaintiffs seek to have remedied in this

case, which became actionable in 2016, could not realistically have been addressed in a

2012 lawsuit that was resolved in 2014.

In short, claim preclusion cannot apply because Plaintiffs did not "actually ha[ve] the chance to be heard" on the present claims in the 2012 suit. *Garity*, 828 F.3d at 856 (emphasis omitted).

c. That leaves issue preclusion. The question here is not whether the *claims* in the present lawsuit were or could have been brought in the prior one. It is, instead, whether an *issue* of relevance to the present lawsuit has already been fully and finally adjudicated, "even if the issue recurs in the context of a different claim." *Taylor*, 553 U.S. at 892.

Issue preclusion applies when "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom [issue preclusion] is asserted was a party or in privity with a party at the first proceeding." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 995 (9th Cir. 2000) (cleaned up).

As was the case with claim preclusion, the "final judgment" and "privity" elements—the second and third elements—are clearly met, for the reasons discussed above. Plaintiffs also do not appear distinctly to dispute one aspect of the first element, namely, that the issues Judge Kobayashi decided were essential to her final judgment.

The parties' dispute centers, instead, on whether an issue that Judge Kobayashi decided is "identical" to "one which is sought to be relitigated." *Id.* Defendants argue

that issue preclusion bars re-litigation of whether the PDS machines are gambling

devices.  In their view, that issue was already decided in Defendants' favor in the 2012

action.  They understand that decision to have conclusively determined that the PDS

machines were "illegal gambling devices," which they take to mean that the machines

are contraband and valueless as a matter of law.  *See* ECF No. 37-1, at PageID.120, 137.

Judge Kobayashi's ruling does not go as far as Defendants suggest.  Judge

Kobayashi held only that "*at the time of the seizures*" the "*use* of the PDS terminals

constituted 'gambling'" within the meaning of Hawaiʻi state law.  *PJY Enters., LLC*, 2014

WL 12694456, at *15 (emphases added).  The ruling thus conclusively established that

the eighty-one PDS machines were *used* for gambling at the time they were seized.  But

it did not determine that the machines could *only* be used for gambling—let alone that

Plaintiffs could never have had any lawful title in the machines (or their component

parts) or that the machines lack value as a matter of law.

As noted earlier, Hawaiʻi state law defines a "gambling device" as "any device,

machine, paraphernalia, or equipment that is used or usable in the playing phases of

any gambling activity . . . [including] gambling by a person involving the playing of a

machine."  HRS § 712-1220(5).  Logically speaking, the fact that a device, machine, or

equipment is "used or usable" for gambling in one timeframe does not mean that it

necessarily is "used or usable" for gambling for all time.  And while Judge Kobayashi's

ruling established that the eighty-one PDS machines were used for gambling at the time

20

they were seized, she had no occasion to resolve whether there was something inherent

in the machines that made them forever "used or usable" for gambling and nothing

else.

In other words, as Plaintiffs point out, Judge Kobayashi did not rule that the PDS

machines are akin to items, such as certain controlled substances, that can *never* be

lawfully owned and therefore have no legal value—regardless of how they are used.

*See* ECF No. 46, at PageID.895-96.  Judge Kobayashi instead effectively ruled that the

PDS machines were "derivative contraband" (property "whose possession becomes

unlawful when it is used in committing an illegal act"), rather than "contraband per se"

(property "whose possession is unlawful regardless of how it is used").  *State v. Talo*,

153 Hawaiʻi 63, 72 n.17, 526 P.3d 588, 597 n.17 (2023) (quoting Black's Law Dictionary

(11th ed. 2019)).

Hawaiʻi state law dovetails with Judge Kobayashi's treatment of the PDS

machines.  State law provides that "[a]ny gambling device . . . may be ordered forfeited

to the State, *subject to the requirements of chapter 712A*."  HRS § 712-1230 (emphasis

added).  The requirements of chapter 712A—as *Alm* makes clear—include the

government's obligation to initiate timely forfeiture proceedings.  *See Alm*, 150 Hawaiʻi

at 333-35, 501 P.3d at 302-04.  And if the government fails to do so, the property must be

returned to the owner.  *Id.* at 335, 501 P.3d at 304.

21

This forfeiture treatment of gambling devices signals that they are derivative contraband, rather than contraband per se. That must be true because the Hawaiʻi Supreme Court would not have spoken of, say, crystal methamphetamine in the way it spoke of gambling devices in *Alm*. The state need not seek the forfeiture of such drugs. *See* HRS § 712A-5(1)(d) (2014) ("Contraband . . . shall be seized and summarily forfeited to the State without regard to the procedures set forth in this chapter."); HRS § 329-55(c) (2022) ("Controlled substances listed in schedule I that are possessed . . . are contraband and shall be seized and summarily forfeited to the State."). For that reason, a failure to timely seek their forfeiture would not require their return to the person who purported to own them. Such drugs may be "summarily forfeited to the State" precisely because, under the law, it generally is not possible to hold a legal property interest in them at all.

State law does not treat gambling devices that way. And by ruling that the machines were *forfeitable*—rather than ruling that there could be no lawful property interest to forfeit in the first place—Judge Kobayashi's ruling did not treat the devices that way, either. Plaintiffs' current claims are therefore not barred by issue preclusion.

## B.    Plaintiffs' Negligence and Bailment Claims

As an alternative argument, Defendants contend that even if Plaintiffs' claims are not barred by claim or issue preclusion, the negligence and bailment claims nonetheless are not viable legal theories under Hawaiʻi state law.

At first glance, there does not appear to be anything particularly novel about Plaintiffs' claims. Plaintiffs seek to recover damages to their PDS machines under negligence and bailment state-law theories. Every law student learns how common and widely accepted a tort theory of negligence is. And while bailment law may not be as prominent as it was when Justice Joseph Story wrote a treatise on the topic, it too is an uncontroversial and well-accepted theory of recovery.

The wrinkle here is that the Hawaiʻi Supreme Court has not definitively resolved whether negligence and bailment claims are viable in factual circumstances comparable to those of this case—that is, when law enforcement seizes and holds property belonging to private parties. That is to say, while negligence and bailment are well-established claims, it is unclear whether state law allows these claims to be brought against the government for property that has been seized in connection with a criminal investigation.[10]

When a matter of state law is unresolved, this Court has discretion to certify legal questions to the Hawaiʻi Supreme Court when such an issue is "determinative of the cause" and "there is no clear controlling precedent in the Hawaii judicial decisions."

---

[10]    All parties accept that Hawaiʻi state law governs these claims: Although the action was removed due to the Court's federal question jurisdiction over the federal constitutional claims, the negligence and bailment claims fall under the Court's supplemental jurisdiction. *See* ECF No. 1, at PageID.4; 28 U.S.C. § 1367(a). Accordingly, the Court applies state substantive law to these claims. *See Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011).

*Richardson v. City & Cnty. of Honolulu*, 802 F. Supp. 326, 345 (D. Haw. 1992).

Nonetheless, the Court "should not certify questions when the answer is reasonably

clear and the court can, using its best judgment, predict how the Hawaiʻi Supreme

Court would decide the issue." *Roe v. Ram*, No. CIV. 14-00027, 2014 WL 4276647, at *8

(D. Haw. Aug. 29, 2014).  Moreover, at the hearing on Defendants' motion, all parties

urged the Court to resolve the state-law issues without certification to the Hawaiʻi

Supreme Court.  Given the parties' request, and given that the Court finds the answers

reasonably clear here, the Court exercises its discretion not to certify the issues and

therefore turns to their merits.

    1.  The first disputed legal theory is negligence.  To have a valid claim for

negligence under the facts of this case, Defendants must have owed Plaintiffs a duty to

maintain the PDS machines in operational condition—or at least a condition not

unreasonably worse than that—once they were seized.  Defendants offer a single

argument for why no negligence claim lies here:  the seized machines, they say, are

contraband, and there is never an obligation to return contraband, let alone keep it in

good condition.  ECF No. 37-1, at PageID.141.  And, Defendants argue, if there was no

duty owed to the Plaintiffs, then there can be no valid negligence claim.

    This argument fails for the same reason Defendants' issue preclusion argument

does:  Hawaiʻi state law does not treat gambling devices as contraband per se.  Instead,

it treats such devices as derivative contraband:  they are forfeitable, but if the

government does not timely initiate forfeiture proceedings, the owners are entitled to get their property back.  *See Alm*, 150 Hawaiʻi at 335, 501 P.3d at 304.  Because they have not shown that the PDS machines were contraband per se, Defendants have failed to show that they owed no duty to the Plaintiffs as a matter of law.

To be clear, the Court does not rule that a negligence claim is unquestionably available when property has been seized by law enforcement.  The Court merely predicts that the Hawaiʻi Supreme Court would not reject a negligence-related duty based on the specific—and only—argument Defendants have raised against it here.  If there are other arguments for why negligence should not be a valid claim in this context, resolution of those arguments must await a case in which a party makes them.

2.  Plaintiffs also advance a bailment claim.  "A bailment is a delivery of personal property by one person to another in trust for a specific purpose, with an express or implied contract that the property will be returned or accounted for when the specific purpose has been accomplished or when the bailor reclaims the property."  *United Truck Rental Equip. Leasing, Inc. v. Kleenco Corp.*, 84 Hawaiʻi 86, 90, 929 P.2d 99, 103 (App. 1996) (cleaned up).  In Hawaiʻi, "the elements of a classic bailment are the intent to create a bailment, delivery of possession of the bailed items, and acceptance of the items by the bailee."  *Waugh v. Univ. of Haw.*, 63 Haw. 117, 132, 621 P.2d 957, 968 (1980).

Defendants argue that there is no viable bailment claim under Hawaiʻi law here because the parties did not intend to create a bailment.  Defendants contend, in

particular, that because the police's seizure of private property is unilateral, there was "no mutual intent to contract." ECF No. 37-1, at PageID.142. Defendants also argue that there could be no bailment for the seized property because Judge Kobayashi previously ruled that the PDS machines were illegal gambling devices, with the consequence—in Defendants' view—that Plaintiffs never could have expected their property to be returned. *See id.* at PageID.141-43.

In response, Plaintiffs point out that some courts in California and New York have recognized bailment claims even when the government has seized private property, and they argue that Hawaiʻi law is no less hospitable to holding Defendants liable as bailees for failing to properly care for such property. ECF No. 46, at PageID.894-95.

Again, the Hawaiʻi Supreme Court has not resolved whether Defendants may be held liable for a bailment claim for seized private property. But based on existing state law, this Court predicts that the Hawaiʻi Supreme Court *would* find that a bailment relationship can be created in these circumstances. It is true that bailment "is *normally* a consensual transaction." *Waugh*, 63 Haw. at 132, 621 P.2d at 968 (emphasis added). But that cannot be the end of the analysis, for whether the law will recognize a bailment relationship ultimately depends on the facts of the case at hand. As the Hawaiʻi Supreme Court has explained, "[i]n some situations courts will imply the existence of a bailment even though not every element of a consensual bailment is present." *Id.* at 133,

26

621 P.2d at 969; *see also Pearsons v. United States*, 723 F. Supp. 3d 825, 835 (C.D. Cal. 2024)

(noting that the Federal Circuit has "not completely foreclose[d] the possibility that the

involuntary seizure of property might form the basis of an implied-in-fact bailment

contract" in the federal forfeiture context and that the U.S. Supreme Court has

"suggested that a plaintiff whose property has been seized may sue the Government

under just such a theory").

Significantly, the Hawaiʻi Supreme Court held in *State v. Ching*, 67 Hawaiʻi 107,

112, 678 P.2d 1088, 1093 (1984), that police may act as "gratuitous bailees" when holding

lost property, despite the fact that the police and the owner of lost property—who may

never be identified—typically have not mutually consented to a bailment contract.

Although the unidentified owner of lost property is not similarly situated to the known

owner of property that has been seized in connection with a criminal case, one

similarity is evident:  neither owner has deliberately signed up for a bailment

relationship with the police.

Defendants have not identified any persuasive reason why the Hawaiʻi Supreme

Court would decline to hold the police accountable as bailees when they seize property,

even though they are unquestionably liable as bailees when they come into the

possession of lost property.  If anything, one would expect the police to be *more*

prepared to responsibly handle property that they have intentionally targeted and

seized, rather than lost property they stumble upon (and might perhaps wish they did

not).  And that logic has been endorsed by the Corpus Juris Secundum treatise on

bailment, which the Hawaiʻi Supreme Court has, in the past, cited favorably.  *See, e.g.,*

*Ikeda v. Okada Trucking Co.*, 47 Haw. 588, 599, 393 P.2d 171, 177 (1964) (citing 8 C.J.S.

Bailments §§ 25 and 40).  As that treatise advises, "[a] government is a bailee when a

police officer seizes property from an arrestee, although seizure by the government of

property that it has reason to believe is being used in violation of law does not

automatically create a bailment."  8 C.J.S. Bailments § 2 (footnote omitted).

The statement in this treatise indicates that the government can become a bailee

even in the context of property seized in connection with a criminal case—for example,

during an arrest.  To be sure, the treatise notes that a bailment relationship is not

"automatically" created whenever the government seizes property "it has reason to

believe is being used in violation of law."  *Id.*  For however long the government retains

property as evidence in connection with a pending criminal case, for example, it is

arguable that the government would not qualify as a bailee.  Likewise, if the

government is proceeding through timely forfeiture proceedings, it likely would hold

property under its forfeiture authority, rather than in the role of a bailee.  *See* HRS

§ 712A-7(1) (2014) ("In the event of a seizure for forfeiture under section 712A-6, the

property is not subject to replevin, conveyance, sequestration, or attachment but is

deemed to be in the custody of the law enforcement agency making the seizure for

forfeiture.").  But if the criminal case ends and no forfeiture proceedings are brought,

and yet the government insists on retaining private property, bailment is an appropriate

way to describe the relationship that results.  *See Wikiert v. City of New York*, 7 N.Y.S.3d

313 (N.Y. App. Div. 2015) (observing that a bailment may be created between a

government and a private citizen when the seized property was "not needed as arrest

evidence").

In this case, HPD initially seized the PDS machines in connection with an

ongoing criminal case.  At that time, Defendants were holding onto the property

because they had "reason to believe" the machines had been "used in violation of law."

8 C.J.S. Bailments § 2.  But once the criminal charges were dropped in 2016—by which

time the forfeiture window had expired—HPD took on a bailment relationship by

holding onto Plaintiffs' property against their will.  *See generally Awaya v. State*, 5 Haw.

App. 547, 555, 705 P.2d 54, 61 (App. 1985) ("[A] defendant has a right to property

lawfully seized where the government no longer has reason for its retention. . . . And in

such case a motion or petition for return of the property may be addressed to the equity

jurisdiction of the proper court." (cleaned up)).  Just as the police in *Ching* were

considered gratuitous bailees while holding lost property "for the benefit of the owner"

until the owner could be found, here, HPD became a bailee when it held onto Plaintiffs'

property after the criminal charges were dropped and the time for forfeiture had

passed.  67 Haw. at 112, 678 P.2d at 1093; *see also Terranova v. State*, 445 N.Y.S.2d 965, 969

(Ct. Cl. 1982) (holding that the state was an implied-in-law bailee because "[t]here is no

indication the property seized from claimant was contraband or property otherwise subject to forfeiture to or destruction by the State").

The Court therefore predicts that the Hawaiʻi Supreme Court would find each of Defendants' arguments for precluding a bailment relationship unpersuasive under the facts of this case. Here again, the Court does not predict that there are *no* conceivable arguments against such a bailment claim. It concludes only that Defendants have not offered a persuasive one.

## C.    Damages

Defendants' next argument again takes aim at Plaintiffs' negligence claim, but from another angle: Defendants contend that Plaintiffs' negligence claim should be dismissed because Plaintiffs have not offered legally sufficient evidence of damages.

Defendants advance two alternative reasons for this shortcoming: first, that the PDS machines are contraband as "illegal gambling devices," and second, that "their component parts have no market value." ECF No. 37-1, at PageID.140. The first of those proffered reasons is not sound: As discussed above, the PDS machines are not per se contraband. And so it is at least conceivable that they might have some value—either for resale in a different market or for their component parts. That leaves Defendants' second argument: that Plaintiffs have not offered evidence of such value.

"It is well-settled that, in any negligence action, the plaintiff—not the defendant—has the burden of proving the requisite elements," including the element of

30

damages. *Miyamoto v. Lum*, 104 Hawai'i 1, 15, 84 P.3d 509, 523 (2004). To get to trial on

the damages issue, Plaintiffs must have presented admissible evidence that would

support a reasonable jury's finding that the PDS machines had value at the time that

they filed this suit. *See Unicon Fin. Servs., Inc. v. InterCept, Inc.*, 256 F. App'x 27, 29 (9th

Cir. 2007) ("Mere allegation and speculation do not create a factual dispute for purposes

of summary judgment." (cleaned up)). That is true not just on the question of *whether*

Plaintiffs suffered damages, but also on the *amount* of damages. *See Exotics Hawaii-Kona,*

*Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Hawai'i 277, 292, 172 P.3d 1021, 1036 (2007)

("The extent of plaintiff's loss must be shown with reasonable certainty and that

excludes any showing or conclusion founded upon mere speculation or guess."

(cleaned up)).

  In support of their contention that the PDS machines' component parts are

worthless, Defendants present a declaration from an alleged expert who opines that the

machines would indeed be worthless because they are illegal gambling devices, and

that their component parts similarly would not bring in more than a nominal sum. ECF

No. 38-17, at PageID.417-18 (Meyer Decl. ¶¶ 7-10). Plaintiffs identify reasons why a

jury might not credit this witness's anticipated testimony—principally, that he has no

expertise in this subject matter and his declaration and report are therefore suspect. *See*

ECF No. 46, at PageID.897. Whether to credit any witness is a question not for the

Court at summary judgment, but for the jury. The Court therefore does not rely on

Defendants' proposed expert in assessing whether Plaintiffs themselves have offered

legally sufficient evidence of damages.

Turning to Plaintiffs' proffered evidence, the Court concludes that three pieces of

evidence they offer are collectively—though just barely—sufficient to raise a genuine

dispute of material fact as to damages.  First, Plaintiffs attach several HPD reports from

the December 2012 and February 2013 seizures that list the PDS machines as worth

$3,500 each.  *See* ECF No. 45-8, at PageID.697-705.  Second, Plaintiffs "estimate" that

"the useful life of a PDS machine is 10 years."  ECF No. 45-1, at PageID.572 (Yoshimura

Decl. ¶ 9); ECF No. 45-13, at PageID.816-17.  And third, Plaintiffs offer the declaration of

Yoshimura, the manager-member of PJY Enterprises, LLC, who represents that there

were buyers for these machines in the Philippines in 2016, and a different buyer in

Guam through December 2023 (at which time that buyer passed away).  ECF No. 45-1,

at PageID.572-73 (Yoshimura Decl. ¶¶ 11-12).

Taking these pieces together—and crediting all rational inferences in Plaintiffs'

favor, as the Court must do at the summary judgment stage, *T.W. Elec. Serv., Inc.*, 809

F.2d at 631—the Court concludes that a jury could rely on this evidence to conclude

that, had HPD taken better care of the PDS machines, they would have had value at the

time Plaintiffs filed this suit in 2022.  The HPD reports show that the machines are not

inexpensive:  they were estimated to be worth $3,500 each at the time of seizure.  To be

sure, a jury that credited the HPD reports still would have to account for depreciation

from the initial $3,500 estimate. But the estimate regarding the machines' useful life shows that they likely would have retained at least some of their value as late as 2022 or 2023. And the evidence that Yoshimura had identified possible buyers for the machines further shows that the machines had market value even as late as 2023. Accordingly, the jury's task in calculating damages would be sufficiently bounded by these relevant figures and pieces of evidence so as to avoid concerns about jury speculation.[11]

The Court therefore concludes that Plaintiffs have adequately shown a genuine dispute of material fact as to damages for their negligence claim.

### D.    Statutes of Limitations

Up to this point, the Court has determined that all three of Plaintiffs' claims remain undisturbed by claim and issue preclusion and are properly grounded in Hawaiʻi state law. It has also concluded that Plaintiffs' negligence claim is adequately supported with sufficient evidence of damages. But there remains one final obstacle: the statutes of limitations. And it is here that Plaintiffs' claims ultimately stumble.

---

[11]    Yoshimura further asserts that PDS machines should be depreciated under a particular IRS schedule and would still have value today even under this depreciation rate. ECF No. 45-1, at PageID.573-74 (Yoshimura Decl. ¶ 15). But that schedule is not attached, Plaintiffs have identified no expert who could explain it, and Plaintiffs do not otherwise explain why that calculation would be appropriate for the jury to use. The Court therefore declines to consider that proffered evidence in deciding whether Plaintiffs have met their burden on the damages issue. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) ("[S]ummary judgment is appropriate where [parties] have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages.").

1.  To assess whether Plaintiffs' lawsuit is untimely, the Court must first identify

the appropriate statutes of limitations periods and identify the appropriate law to

determine when those claims accrued—that is, when the clock started ticking on a

lawsuit.  When considering state-law claims under its supplemental jurisdiction,

"federal courts generally apply state statutes related to the commencement and tolling

of statutes of limitations."  *Aana v. Pioneer Hi-Bred Int'l, Inc.*, 965 F. Supp. 2d 1157, 1178-

79 (D. Haw. 2013) (cleaned up).  Here, Plaintiffs have brought negligence and bailment

claims.  The parties agree that under Hawai'i state law, negligence claims are subject to

a two-year statute of limitations.  *Id.* at 1179.  They also agree that because there is no

explicit statute of limitations for bailment claims, the catch-all six-year period should

apply.  *See* ECF No. 37-1, at PageID.137; ECF No. 54, at PageID.970.

Plaintiffs separately bring a federal constitutional claim.  Here too, the parties

agree that "the appropriate statute of limitations to apply to the [federal] constitutional

causes of action is Hawaii's catch-all statute of six years."  *Tamura v. F.A.A.*, 675 F. Supp.

1221, 1224 (D. Haw. 1987); ECF No. 53, at PageID.943; ECF No. 54, at PageID.972-73.

The parties also accept that Hawai'i state law should apply to the question of

when Plaintiffs' federal and state-law claims accrued.  ECF No. 53, at PageID.943; ECF

No. 54, at PageID.969.  Under Hawai'i state law, the statute of limitations for a property

damage tort claim begins to run "when the plaintiff knew or in the exercise of

reasonable care should have discovered that an actionable wrong has been committed

against his property." *Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of Dirs. v. Venture 15, Inc.*, 115 Hawai'i 232, 277, 167 P.3d 225, 270 (2007) (quoting *Basque v. Yuk Lin Liau*, 50 Haw. 397, 398, 441 P.2d 636, 637-38 (1968)). And while there may be factual disputes about whether a plaintiff has "belated[ly] discover[ed] . . . the cause of action," the Hawai'i Supreme Court has warned plaintiffs that they may not "s[it] on [their] rights to gain [a] legal advantage." *Id.* at 277-78, 167 P.3d at 270-71 (cleaned up).

2. Since the parties agree that the statutes of limitations for Plaintiffs' claims is, at most, six years, the key dispute is *when* the claims accrued. Hawai'i state law does not provide a ready-made answer to this accrual question. But here, for the same reasons outlined above, the Court exercises its discretion not to certify the question to the Hawai'i Supreme Court—and instead predicts how that court would resolve it.

Defendants argue that the statutes of limitations period started running on the dates of the seizures in 2012 and 2013, or at the very least, that "Plaintiffs' knowledge of their potential claims was evident when they participated in the 2012 Lawsuit contesting the lawful seizure of PDS gambling devices." ECF No. 37-1, at PageID.138. Plaintiffs, on the other hand, contend that their claims accrued over ten years later: the day they inspected the PDS machines at HPD's warehouse, September 27, 2024. ECF No. 46, at PageID.894. And because Plaintiffs brought this lawsuit on November 15, 2022, they apparently take the position that they brought their claims *before* the statutes of limitations period had even started running.

35

The Court predicts that the Hawai'i Supreme Court would hold that neither Defendants nor Plaintiffs have it right. Defendants push the accrual date too far into the past (in 2012 or 2013), and Plaintiffs nudge it too far forward toward the present (in 2024). Instead, the Court determines that Plaintiffs' claims accrued sometime shortly after October 27, 2016—once the criminal charges were dismissed and Plaintiffs knew or should have known Defendants still would not return the PDS machines.

a. As an initial matter, it is clear that Plaintiffs' claims did not accrue as late as when they saw the machines in September 2024. Actual knowledge may start the clock in *some* cases. But in determining the accrual date, courts focus on when plaintiffs should have known that their rights were being violated. *See Aana*, 965 F. Supp. 2d at 1179 (noting that the statute of limitations for negligence claims in Hawai'i starts "to run when [a] plaintiff discovers, or through the use of reasonable diligence should have discovered, (1) the damage; (2) the violation of the duty; and (3) the causal connection between the violation of the duty and the damage" (cleaned up)). The question, then, is not when Plaintiffs *actually knew* that the machines were damaged; instead, the accrual point is when Plaintiffs *should have known* their property rights were being violated.

As a backstop, Plaintiffs contend that the date of the Hawai'i Supreme Court's decision in *Alm*—2021—is the proper accrual date. That argument is no more persuasive. In *Alm*, HPD "re-seized" the seventy-seven PDS machines at issue there nearly two years after initially seizing them; a week later, the Honolulu prosecutor's

office began administrative forfeiture proceedings. 150 Hawai'i at 331, 501 P.3d at 300.

PJY Enterprises, LLC challenged the forfeiture by filing a claim to the seventy-seven

PDS machines and requesting judicial review of the administrative forfeiture. *Id.* The

Hawai'i Supreme Court held that HPD and the prosecutor office's failure to comply

with the statutory deadlines to begin administrative forfeiture proceedings within sixty-

five days of the initial seizure required the return of the seventy-seven machines to the

plaintiffs. *Id.* at 335, 501 P.3d at 304. Plaintiffs in this case argue it is only because of the

*Alm* decision that they were able to initiate this action to seek the return of their

property or, in the alternative, damages for the machines that are no longer in pristine

condition.

But that argument, too, misses the mark. As Defendants point out, the statutes of

limitations period begins to run when a plaintiff knows or ought to know of the "*facts*

which are necessary for an actionable claim"; the limitations period does not wait until

a "plaintiff learns of the legal duty upon which [they] may base a cause of action." *Hays*

*v. City & Cnty. of Honolulu*, 81 Hawai'i 391, 398, 917 P.2d 718, 725 (1996) (cleaned up).

*Alm* did not create a new cause of action—it simply affirmed the legal duties that were

already incumbent upon HPD and the prosecutor's office, whether Plaintiffs in this case

were aware of that duty or not. And as noted below, Plaintiffs were in a particularly

good position to be aware of that duty since they themselves initiated *Alm* to recover

the seventy-seven machines at issue in that case. Plaintiffs, therefore, could have

37

brought a similar claim involving the eighty-one machines at issue here at some point

before November 2022, but simply chose not to do so.  Accordingly, the *Alm* decision

cannot mark the point at which Plaintiffs' cause of action accrued.

      b.  Although Plaintiffs push the accrual date too far toward the present,

Defendants' proposed accrual date is too far in the other direction.  In Defendants'

view, Plaintiffs' claims accrued ten years earlier, when the eighty-one machines were

seized in 2012 and 2013.  That cannot be correct.

      Defendants' position on accrual falls short for the same reason that their claim

preclusion argument failed:  Until the state trial court announced that it was dismissing

the criminal charges in fall 2016, Plaintiffs did not have a viable claim that Defendants

were improperly intruding upon their property rights in the eighty-one PDS machines.

If Plaintiffs had asked for their property back before that date, Defendants would

have—as Judge Kobayashi's ruling intimated—been within their rights to say no.  Put

simply, Plaintiffs had no obligation to bring a lawsuit for the return or safekeeping of

their property at a time when Defendants had a right to hold that property as evidence.

      c.  While Plaintiffs' and Defendants' positions are wide of the mark, a

different date—October 27, 2016—is just about right.

      The undisputed evidence shows that on October 27, 2016—after the state trial

court filed its order dismissing the criminal charges—Miller, Jr. "went down to the

Honolulu Police Department . . . and asked that the 81 PDS machines be released to

[him]."  ECF No. 45-3, at PageID.579 (Miller, Jr. Decl. at ¶ 5).[12]  HPD refused to release the machines without the approval of the Honolulu prosecutor's office.  *Id.*  At some point thereafter, Miller, Jr. returned to "check" on the machines and was given a definitive answer that "the Prosecutor's Office would not agree to release the 81 PDS machines."  *Id.* at PageID.579-80.

As of the date that the state trial court filed an order dismissing the criminal charges against Plaintiffs, Defendants had no authority to hold the machines as evidence.  Moreover, by that date, Defendants were well past the deadlines for administrative forfeiture recognized in *Alm*.  And so by October 27, 2016, Defendants' alleged constitutional duty to return (and protect) Plaintiffs' property, as well as to avoid negligent harm toward that property, were all actionable.  *Cf. Bertin v. United States*, 478 F.3d 489, 493 (2d Cir. 2007) ("When property is seized and not returned or forfeited, the claimant knows that [they] ha[ve] a present right to its return, and shouldn't be permitted to postpone [their] request for its return indefinitely." (cleaned up)); *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1212-13 (10th Cir. 2001) (same).  It follows that once Plaintiffs knew or should have known that Defendants were refusing

---

[12]    As noted earlier, although Miller, Jr.'s declaration states that he visited HPD on August 9, 2016, Plaintiffs' counsel clarified at the hearing that the complaint more accurately described his client's testimony:  Miller, Jr. visited HPD on the day that the order dismissing the charges was filed, on October 27, 2016.  The Court has decided to use this latter date in its analysis, as it is the most generous interpretation of Plaintiffs' evidence in the record.

to return the machines, despite having no lawful basis to deny that request, the statutes of limitations clock started ticking on Plaintiffs' negligence, bailment, and constitutional claims. From that point onward, any damage Defendants caused to the machines might increase the monetary damages that Plaintiffs would be entitled to, but it would not change the fact that their claims had already accrued.

Resisting this conclusion, Plaintiffs insist that each new harm to their machines should start the statutes of limitations clock anew. But that view of Hawaiʻi accrual law would produce anomalous results. If, as Plaintiffs contend, the statute of limitations period for constitutional and state-law claims for damages to property restarted each time a bit of damage to property took place—even though the owner had not timely sued for the return of that property—then a person who had property seized twenty-five years ago could bring a timely claim today if the government caused some fresh damage to it in 2025. By 2025, a claim for the outright return of the hypothetical property would have long vanished. Yet under Plaintiffs' view of accrual, a property owner could bring a claim for *damages* to property even though they no longer had the legal right to demand that property be *returned* to them.[13]

---

[13]    Indeed, at the hearing on Defendants' motion, Plaintiffs could not explain why, under their view of accrual, Plaintiffs could not have waited until 2050 to bring their constitutional and state-law claims against Defendants if the machines were still being held in 2050 and Defendants caused new damage to the machines at that future date.

Hawaiʻi state law does not countenance—much less require—such anomalies. It requires a plaintiff to bring a claim in a timely manner, rather than to lay in wait until a more propitious time. *See Ass'n of Apartment Owners of Newtown Meadows*, 115 Hawaiʻi at 277-78, 167 P.3d at 270-71 (warning plaintiffs that they may not "s[it] on [their] rights to gain [a] legal advantage" (cleaned up)); *see also Off. of Hawaiian Affs. v. State*, 110 Hawaiʻi 338, 364, 133 P.3d 767, 793 (2006) (holding that the plaintiff's claims were barred by the statute of limitations because "although the plaintiffs here may not have appreciated all the legal consequences flowing from the [defendant's] alleged nonfeasance or the extent of their monetary damages, they knew of the material facts of the instant breach of trust claims" four years before filing their claims, which was "over two years after the applicable statute of limitations ended"). And it is best understood to provide that when the government retains seized property after a criminal case has ended and administrative forfeiture proceedings are no longer timely, the owner of that property (absent tolling) must bring suit within six years of the date the owner knew or should have known that the government was refusing to return the property. That six-year clock does not restart even if the government causes additional damage to the property at various points throughout the six years of possession.[14]

---

[14]    Under some circumstances, the "continuing wrong" doctrine can essentially restart the statute of limitations clock for "repeated instances or continuing acts of the same nature, as for instance, repeated acts of sexual harassment or repeated discriminatory employment practices." *Nesovic v. United States*, 71 F.3d 776, 778 (9th

d.  Plaintiffs' final accrual-related contention is a factual one:  they argue that there is no way of knowing when Miller, Jr. received notice from Defendants that the machines would not be returned.  The record only shows that he asked for the machines' return on October 27, 2016, and then got a definitive answer sometime thereafter "in 2016."  ECF No. 45-3, at PageID.579 (Miller, Jr. Decl. ¶ 5).  Because that answer could in theory have come anytime, including sometime after November 15, 2016, it is at least possible that the filing of this action on November 15, 2022, was not untimely.

But while the existing record does not clarify *exactly* when Plaintiffs knew or should have known that they could file the claim for the machines' return, this uncertainty is not enough to resist summary judgment.  Defendants identify October 27, 2016, as the date on which the criminal charges were dismissed—a date more than six years before the filing of this suit.  ECF No. 38-2, at PageID.168.  And they point to Plaintiffs' own acknowledgment that they learned of Defendants' unwillingness to

---

Cir. 1995) (quoting *Sisseton-Wahpeton Sioux Tribe, of Lake Traverse Indian Rsrv., N. Dakota & S. Dakota v. United States*, 895 F.2d 588, 597 (9th Cir. 1990)).  But that doctrine would not save Plaintiffs from the statutes of limitations here.  Plaintiffs' claims are best understood, not as involving continuing acts of the same nature—as in a sexual harassment case—but as a "wrong" constituting "a single act":  Defendants' refusal to return their property once the criminal charges were dismissed.  *Id.*  That single act, "in turn," resulted in the complained-of damages to their machines.  *Id.*  Put differently, Defendants complain only of the "ill effects from an original violation."  *Id.* (quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)).  And that is not enough to constitute a continuing violation.

return the property sometime shortly afterward in 2016. *See, e.g.*, ECF No. 38-18, at

PageID.514. Defendants have thus carried their burden under Rule 56(c).

To adequately respond, Plaintiffs "must do more than simply show that there is

some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S.

at 586; *see also Wolf v. Travolta*, 167 F. Supp. 3d 1077, 1091-92 (C.D. Cal. 2016) ("If

defendants meet their burden, the burden then shifts to plaintiffs as the non-moving

party to establish that there is sufficient evidence in the record from which a reasonable

trier of fact could conclude that plaintiffs' claims are not time barred."). But Plaintiffs

have done no more than that. They offer no evidence from which a rational jury could

infer that they learned of Defendants' position sometime on or after November 15,

2022—even if it is metaphysically possible that they did. Indeed, at the hearing on

Defendants' motion, Plaintiffs' counsel candidly acknowledged that he had no evidence

to show that Miller, Jr. learned of Defendants' definitive refusal to return the property

on or after November 15, 2016. His clients, counsel admitted, could not say that. It

follows that there is no evidence from which a rational jury could conclude that Miller,

Jr. received the message that the property would not be returned on or after that date.

Nor do Plaintiffs contend that it took Miller, Jr. any significant amount of time to

convey this message to the other Plaintiffs. Accordingly, while the record does not

pinpoint that exact date, there is no evidence that would support a rational jury finding

that Plaintiffs' notice came on or after November 15, 2016.

Because there is no evidence from which a rational jury could infer that Plaintiffs first knew or should have known of the facts that would establish their claims on or after November 15, 2016, Defendants have met their burden of establishing their statutes of limitations defense.

3.  Although Plaintiffs' lawsuit was filed more than six years after their claims accrued, their claims could still be timely if some portion of the statutes of limitations period were tolled.  But Plaintiffs have advanced no persuasive argument for tolling.

a.  Their principal contention is that in *Alm*, the Hawaiʻi Supreme Court ordered Defendants to return the machines at issue in that case and explained that the "remedy for noncompliance with the timing deadlines of forfeiture" was the "return of the property."  150 Hawaiʻi at 334, 501 P.3d at 303.  From there, Plaintiffs argue that because Defendants did not timely seek forfeiture of the eighty-one machines at issue here, the remedy must be the return of their property.

The analytical error in Plaintiffs' argument is the apparent assumption that they held a right to the return of property that they could seek to enforce at any time—free from statutes of limitations considerations.  But the right to return of property is not self-executing.  If Plaintiffs believed they had the right to the return of the eighty-one machines, it was incumbent upon them to bring a lawsuit to seek that relief and to do so in a timely manner.  Because Plaintiffs sought that relief too late, they may no longer obtain it now.  To put a finer point on it, their reliance on the remedial language of *Alm*

44

is misplaced because no timeliness issue arose there; the *Alm* plaintiffs had asserted

their interest in the disputed property as early as 2014 by challenging the forfeiture

procedures in court.

Nor is there any basis to argue that Plaintiffs' claims as to the eighty-one

machines at issue here should be tolled merely because Plaintiffs were actively litigating

the return of other machines in *Alm*.  Statutes of limitations do not allow plaintiffs to

pick and choose which lawsuits they wish to advance first, while saving the rest for

later through tolling.  While plaintiffs understandably may choose not to litigate all

claims available to them, their time to file suit is not tolled merely because they are busy

litigating a subset of their accrued claims.  *Accord Hun v. Ctr. Props.*, 63 Haw. 273, 284,

626 P.2d 182, 190 (1981) (holding that the two-year wrongful death statute of limitations

was not tolled while a workers' compensation claim was pending because "[t]he

purposes underlying the statute of limitations would clearly be frustrated by tolling the

statute while this worker's compensation claim was being pursued" and noting that

"[a]fter seven years, evidence may have been lost, memories faded and witnesses

disappeared").

b.  Plaintiffs offer one final argument for tolling, which focuses not on their

own litigation choices, but on Defendants' conduct.  In particular, Plaintiffs argue that

even if their claims accrued shortly after the October 27, 2016, order dismissing the

criminal charges—as the Court has held—the statutes of limitations should be tolled

because Defendants did not allow Plaintiffs to inspect the eighty-one machines until 2024 and they therefore were not able to discover, until that more recent date, the extent of damage to their property.

There are two situations in which a "discovery" rule of the sort Plaintiffs invoke would toll the applicable statutes of limitations date:  (1) if a plaintiff is unable "to ascertain the necessary factual foundation upon which to base the elements of" their claims, or (2) if there was an "alleged concealment of facts regarding the cause" of a plaintiff's injuries.  *Hays*, 81 Hawai'i at 397-98, 917 P.2d at 724-25.

Neither of those situations exists in this case.  As detailed above, by October 27, 2016, Plaintiffs knew that their property had been taken, that the time for seeking forfeiture had run, and that the criminal charges had been dismissed.  And by some date shortly after October 27, 2016—a point they cannot show was on or after November 15, 2022—Plaintiffs also knew that Defendants would not return the eighty-one PDS machines.  By that point, then, Plaintiffs had viable claims against Defendants for return of their property and for the proper safekeeping of the property held by HPD.  As noted earlier, any additional damages Defendants caused to the machines after that point might add to the monetary damages that Plaintiffs could recover but would not restart the clock on these already-accrued claims.[15]

---

[15]    Plaintiffs also argue that the statutes of limitations period should be tolled because the *Alm* decision was not issued until December 2021.  But just as the *Alm*

The record clearly shows Plaintiffs were well aware of the facts needed to bring their claims as early as 2014.  At the same time that Plaintiffs failed to bring any action to recover these eighty-one PDS machines, they were engaging in substantial litigation to reclaim the other seventy-seven machines at issue in *Alm* by challenging the State's failure to properly initiate administrative forfeiture proceedings.  The Plaintiffs in this case joined that prior action asking for the return of the other seventy-seven machines in 2014, nearly eight years before initiating the present action.  *See, e.g.*, ECF No. 45-5 (Findings of Fact, Conclusions of Law, and Order in *Kaneshiro v. Eleven (11) Products Direct Machines* (Apr. 6, 2015)).  While it is understandable that a plaintiff might strategically wish to avoid fighting on multiple fronts, the consequence of waiting too long to file the present complaint is that the statutes of limitations have run.

\* \* \*

To recap:  Defendants have carried their burden of showing that Plaintiffs' claims are time-barred, and Plaintiffs have failed to come forward with any evidence suggesting that there is a genuine dispute of material fact as to the timeliness of their lawsuit or that they are entitled to equitable tolling of the statutes of limitations.  The

---

decision does not justify a later accrual date, it does not justify tolling of the running statutes of limitation.  As the Hawaiʻi Supreme Court has explained, "a plaintiff's lack of knowledge regarding a legal duty, the breach of which may have caused the plaintiff injury, will not justify application of the discovery rule."  *Hays*, 81 Hawaiʻi at 399, 917 P.2d at 726.

Court therefore holds that Plaintiffs' claims are barred by the applicable statutes of

limitations.

<u>**CONCLUSION**</u>

Because Plaintiffs commenced this action too late and the statutes of limitations

bar their claims, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

DATED:  February 21, 2025, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 23-00129 MWJS-WRP; *Miller, Jr.,* et al. *v. Honolulu Police Dep't,* et al.; ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

48